1  Steven Hicks

2  3475 Hensley St.

3  Reno, Nevada 89503

4  (775) 747 - 4473

5

```
_____ FILED        ✓ _____ RECEIVED
_____ ENTERED        _____ SERVED ON
            COUNSEL/PARTIES OF RECORD

            MAY 2 1 2012

        CLERK US DISTRICT COURT
          DISTRICT OF NEVADA
BY: _____ DEPUTY
```

6                 IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF NEVADA

8

9                   PETITION FOR JUDICIAL REVIEW

10                                          3:12-CV-00267

11  STEVEN HICKS,                    )

12          Plaintiff, PRO SE        )

13  vs.                             )      Claim No. 6068580

14  Sedgwick / Walmart              )      Appeal No. 34285-DSG, 34725-DSG

15  (Insurer / Employer)            )              34839-DSG, 36343-DSG

16                                  )              37656-DSG, 38175-DSG

17  _____)

18

19              **JURISDICTION AND INTRODUCTION**

20       Pursuant to NRS616C.370 a District Court appeal is available

21  after the final determination of an Appeals Officer and pursuant

22  to NRS 233B.130, the aggrieved may choose to file in the county

23  of his or her residence.

24       The original Appeal was considered March 20, 2012 by Appeals

25  Officer Deborah S. Gallagher.  It was filed April 18, 2012 with

26  the Department of Administration.  It was received by mail on

                                1

1  April 23, 2012. This is a matter of the contested industrial
2  insurance claim of Steven Hicks who had formerly been represented
3  by Lawrence Bernard, Esquire. Sedgwick / Wal-Mart (Insurer /
4  Employer) has been represented by David H. Benavidez, Esquire.

5      The document I received on April 23, 2012 is a six page
6  document entitled "BEFORE THE APPEALS OFFICER" and consists of
7  Sections as follows: "Decision and Order", "Findings of Fact",
8  "Conclusion of Law", "Order", and "Notice of Appeal Rights".
9  I have photocopied this document and marked it "Exhibit 1".
10  There are six issues that are discussed in "Decision and Order"
11  that are seriously distorted issues. The "Findings of Fact"
12  consists of ten numbered Subsections that are basically wrong.
13  There are deliberately wrongful omissions of facts, significant
14  errors, and profound lies. I have documents that counter and
15  contradict each of these ten Subsections and these documents I
16  supply are marked with heavy permanent marker: I have circled the
17  bold words "EVIDENCE SUBSECTION XX" to correspond to each of the
18  Subsections for organization.

19                              **COMPLAINT**

20      What occurred at this Appeal was that myself, Steven Hicks,
21  was placed in a room of microphones and podiums. Mr. Benavidez,
22  Appeals Officer Ms. Gallagher, and my attorney, Mr. Bernard, went
23  to a distant room. I was told that there was first to be a
24  decision on what evidence was valid, so I patiently waited a half
25  hour. My attorney returned to me and told me that all issues had
26  been lost. I expected an actual Appeal. Had I been permitted to

*(left margin, vertical text):* STEVEN HICKS  PRO SE  3475 HENSLEY  RENO NV 89503  (775) 747 - 4473

2

1 speak, or even be present, none of the lies or fictitious
2 information would have been put in print.  I hold Sedgwick /
3 Wal-Mart / Mr. Benavidez in contempt for wasting months of time
4 and money in a mockery of justice and a plethora of lies.  I feel
5 I have documents and evidence worthy of a true Judge.

6      In the "Findings of Fact" Subsection one, I will dismember
7 one of the most fallacious portions of the Appeal.  From my
8 medical records, in May 2000, I had abdominal pain that cleared
9 up with one prescription of antibiotic.  There was a small
10 varicocele, less than the size of a pea, and such a condition is
11 an incidental medical finding.  It is incidental just as a woman
12 may have a calcification in a breast or a person's limb could
13 have a mole.  The profound lie in Subsection one, is "verified
14 an atrophic left testis" because my body returned to normal at
15 the completion of the antibiotic.  Likely I had an epididymal
16 infection and it resolved and in my medical records it was never
17 mentioned again.  Dr. Colleen Capurro, my primary care physician,
18 both then and now, would not have done a secondary ultrasound
19 upon a resolved and improved testis.  Mr. Benavidez is guilty of
20 much more misuse of information - he practically "chants" about
21 it in Subsection four and Subsection nine (I will discuss his
22 chanting behavior elsewhere).  Mr. Benavidez has only one item
23 from the year 2000 and has attempted to transform this into a
24 fact; professionals in the medical field often do a second
25 medical test and second opinions are common in the field of
26 Medicine.  Mr. Benavidez allowed Appeals Officer Ms. Gallagher to

STEVEN HICKS   PRO SE   3475 HENSLEY   RENO NV 89503   (775) 747 - 4473

3

1   believe I had an atrophic left testis and a varicocele so no

2   claim could be made for my actual serious loss of left testis in

3   2010.  Mr. Benavidez deliberately lied, and in reducing the value

4   of my claim, he also caused my own honorable attorney,

5   Mr. Bernard, to confront me.

6        I have unquestionable and unrefutable evidence that I had

7   two testes at the time of my injury in 2010.  There is both paper

8   evidence and medico-legal logic to support that I had two testes

9   as I have repeatedly stated.  The paper evidence is a document

10  created 4 May 2010 and is simply titled "H & P" (Health and

11  Physical), and its author is verified.  This is boldly marked

12  "Evidence Subsection one"; this is available at St. Mary's

13  Hospital and is part of my surgical record.  Mr. Benavidez has

14  this record.  Page two, lines thirteen and fourteen of my H & P

15  read "GROINS: There is a non-reducible right groin mass

16  consistent with incarcerated right inguinal hernia.  Scrotum,

17  testes, and phallus within normal limits."  This is written

18  proof that I had two normal testes after the 2010 industrial

19  accident and hernia surgery.  There is no note of atrophy and

20  varicocele.  Mr. Benavidezs' wrong cite of atrophy of 2000 did

21  not exist and the varicocele of 2000 was still smaller than a

22  pea.

23       My incarcerated inguinal hernia was a medical emergency.

24  No less than two doctors and three nurses prodded, probed, and

25  extensively examined my scrotum.  There was likely a sixth person

26  to examine my scrotum extensively as anesthesia was begun and the

4

1    physiological reason behind this is that anesthesia would have

2    relaxed my body and allowed even more extensive probing of my

3    scrotum and genitalia. All of the medical staff of St. Mary's

4    were seeking to discover the extent of my injury and detect

5    whether bowel or intestine had ruptured into my scrotal sac.

6    This is something called the Standard of Care. A half dozen

7    medical professionals would have noticed and made note of any

8    condition of my testes that was significant or relevant. There

9    is no way any condition of my testes could have been concealed,

10   and especially so, when I was unconscious and fully

11   anesthetized. I do not understand the carelessness of Mr.

12   Benavidez to make a profound lie, while it may reduce my claim's

13   value, if someone with a legal background considers this lie,

14   I think it could be damaging to himself and Sedgwick (and Wal-

15   Mart), his own client. The lie of Mr. Benavidez about left

16   testis atrophy of 2000 could easily be twisted around to imply

17   that I did not receive the full and proper Standard of Care.

18   I believe many people can see the lie of Mr. Benavidez for what

19   it is.

20        To end discussion of the Benavidez lie, I can point out that

21   Mr. Benavidez read my personal information, given in good faith

22   to Dr. Sasse in 2010. I told Dr. Sasse I was a widower, and I

23   think Mr. Benavidez used that information to realize he might

24   actually perpetrate a lie like this against a widower whose wife

25   could not offer testimony in his behalf. Because I have had so

26   little time to prepare this District Court document, I want to

5

1  specifically reserve the right to add more Evidence at a later

2  date.  I know I had an employment physical that was done by a

3  Physicians' Assistant in or around 2004 or 2005 but I do not know

4  how long an employment record may have been kept by a previous

5  employer.

6        Subsection two is one huge omission of a vital fact.

7  The sentence "On May 4, 2010, Dr. Sasse repaired the hernia" is

8  completely and seriously misleading.  The true fact is that Dr.

9  Sasse only partially repaired the hernia; I was left in terrible

10  and unrelenting pain.  I cannot begin to discuss how Dr. Sasse

11  failed or what his learning curve is for a procedure new to

12  himself, but I offer a document from one of the finest doctors

13  in Nevada, Dr. Kevin C. Petersen.  Dr. Petersen  of Las Vegas, on

14  23 November 2010, also done a right inguinal herniorrhaphy.

15  Please see "Evidence Subsection two, page one, and circled under

16  "OPERATIONS PERFORMED" is right herniorrhaphy.

17

18        Subsection three, as a sentence in a legal document, is

19  grammatically correct, but that is its fullest extent.  This may

20  be the hardest point for me to prove as what is wrong is where an

21  organization such as Sedgwick, the insurer, says one thing but

22  their actions are truly another.  I have a page that says my

23  Right Inguinal Hernia is "accepted", but I also have Urology

24  bills from 2010, 2011, and 2012 that have been paid by myself.

25  I had no urology issues in the decade prior to my injury.

26  "Evidence Subsection three" is a page where my Sedgwick Nurse

STEVEN HICKS    PRO SE    3475 HENSLEY   RENO NV, 89503    (775) 747 - 4473

6

1  Case Manager chose my urologist for me.  Dr. Sasse ordered a

2  urological evaluation for me because my left testis had 96

3  percent atrophied on 15 June 2010, and Dr. Sasse consulted this

4  to Kathleen Hartmann, RN.

5      The problem is money.  Sedgwick sets a payment scale so low

6  that there is / was no Reno urologist who will accept Sedgwick

7  patients.  I was not told of this.  Yet I clearly have the

8  Sedgwick Nurse Case Manager that sent me to Dr. Freeman on 3

9  August 2010.  Dr. Sasse had stated to Nurse Case Manager Hartmann

10  that my injury is industrially related and yet in 2011 the best

11  offer that could be made to me for urological care was that I

12  could have free urological care in Las Vegas if I pay my own gas,

13  food, and lodging.  There is supposed to be a form to allow for

14  reimbursement for distant medical travel to approved Sedgwick

15  doctors but I was told this option was not available to me.

16      Another way to look at the pathetic action of Sedgwick is to

17  consider how I was injured in early May 2010 and did not get my

18  claim accepted until latter June 2010.  Ms. Shanna Garrett of

19  Sedgwick told me that, only a week after losing a testis by 96

20  percent, that I could return to work and she could have Dr.

21  Sasse fax my release for work in the same day.  She intended

22  that I should be fired and extinguish my rights to reimbursement.

23      Evidence Subsection three, pages two and three are a

24  prescription reimbursement from my surgery.  My 2010 discharge

25  pain RX cost me $14.54, and if you look at the envelope from

26  Sedgwick it is dated 05 / 06 / 2011 .  My point is that Sedgwick

7

1   took their time to even accept the claim of mine, and then it

2   took something like eleven months for the prescription

3   reimbursement to be mailed to me.  This could be counted as

4   twelve months and a few days from my own point of view of the

5   date of my RIH surgery.

6

7

8

9       Subsection four has some deliberate misrepresentations, and

10  again I blame Mr. Benavidez for the misrepresentation delivered

11  to Appeal Officer Ms. Gallagher.  The correct date should be

12  July 9, 2010 and signed by Dr. J.C. Taitano of Reno Open Air

13  MRI (ROAM).  When Mr. Benavidez was deceiving Appeals Officer Ms.

14  Gallagher he chose not to mention hydrocele.  Hydrocele is very

15  important to properly discuss because a large hydrocele damages

16  a male's testis because there is cutoff of proper blood flow

17  and then testicular cellular death and atrophy occurs in a few

18  weeks.  Hydroceles occur in newborn infants, and men like myself

19  who have had recent abdominal surgery.  Dr. Taitano remarked in

20  his text that my hydrocele is moderately large in degree, and

21  this ultrasound was done over two months since my surgery.  Dr.

22  Sasse was aware of my hydrocele, and I personally blame Dr.

23  Sasse's poor judgement for the loss of 96 percent of my left

24  testis.  This ROAM scrotal ultrasound contradicts Mr. Benavidez

25  lie of May 2000 and the findings of a hydrocele are consistent

26  with having had a surgery in May 2010.  Mr. Benavidez certainly

STEVEN HICKS    PRO SE    3475 HENSLEY    RENO NV 89503    (775) 747 - 4473

1   certainly had access to Dr. Taitano's hydrocele findings, because

2   Sedgwick paid for the ultrasound.  This failure to mention

3   hydrocele speaks literally volumes of the dishonesty of Mr.

4   Benavidez. He knew to supress an important fact that is a

5   surgical complication that happens to also fit a specific time

6   frame (see Evidence Subsection four, the whole page, please).

7

8       Subsection five is a hybrid of omission of facts, followed

9   by some profound lies.  To start the discussion of Subsection

10  five, I will first bring out the fact that since I was under the

11  care of a Sedgwick pain management doctor, then I was not fully

12  repaired as I have previously discussed in Subsection two.  This

13  is a statement that Subsection five just nullified Subsection

14  two.  Sedgwick is the payment source for Dr. Lasko, so any

15  opinions of Dr. Lasko likely did not please Sedgwick but it does

16  mean Sedgwick acknowledges the failure of Dr. Sasse.

17      Dr. Lasko tried multiple pain medications and huge trigger

18  point injections, which unfortunately failed.  I admire Dr.

19  Lasko's tenacity to try to help me heal, and I recall the

20  resistance and trouble he experienced getting approval of some

21  drugs from Ms. Ribadeneira of Sedgwick (see Evidence Subsection

22  five, page one).  I have had to beg Dr. Lasko for Lyrica ( see

23  Evidence Subsection five, page two, circled upper area).  Also,

24  Sedgwick tried to withhold Flexeril (see Evidence Subsection

25  five, page three, circled).  The most important physician note

26  which Dr. Lasko wrote was about my need of re-surgery.  Dr.

STEVEN HICKS   PRO SE   3475 HENSLEY   RENO NV 89503   (775) 747 - 4473

Lasko called it specifically "re-operation", in his notes of 26 October 2010 (see Evidence Subsection five, page four, circled).  Dr. Lasko's most important contribution to my medical care was his observation of my second surgical result from Dr. Petersen.  Three times Dr. Lasko wrote favorably of my second surgery and these excerpts are within bracketed areas of my Evidence (see Evidence Subsection five, pages two, three, and five).

The second portion of Subsection five, about November 23, 2010, is a profound lie because latter November 2010 is beyond the jurisdiction of Sedgwick / Wal-Mart.  By the dishonest actions of Ms. Ribadeneira of Sedgwick, my last Temporary Total Disability (TTD) check was ended in October 2010 and my medical care was suspended (but suspended means terminated whenever people refuse to cooperate).  If you recall that Dr. Lasko wrote re-surgery on October 26, 2010, Sedgwick never intended to keep my claim open for re-surgery.  What Ms. Ribadeneira done was to create a rapid industrial claim closure for me by setting medical appointments for me without my knowledge.  Then she could rapidly close the claim for non-compliance with medical treatment.  It would not be logical for me to miss medical appointments when I was truly sick: I would, of course, miss medical appointments of which I had no knowledge.  It's a great coincidence that I should be missing only the appointments she had set, and yet missed no other medical appointments.  I tried to reconcile with her but she was irreconcilable and continued to talk of claim closure.  I

10

retained Mr. Lawrence Bernard, Esquire, to represent me at the

end of December when Ms. Ribadeneira begun to talk of additional

medical appointments she was ready to accuse me of missing.  I

have a rather crazy letter from her about my missed medical

appointments (Evidence Subsection five, page six).  The letter

talks of my need to set up follow up appointments but she would

refuse to reveal to me where the original appointment(s) was

made.  Mr. Bernard demanded proof of medical appointments of

Ms. Ribadeneira and it then took another month for Ms.

Ribadeneira to admit she had no proof of mailing or notifying me

of the alleged medical appointments she had set.  Two months of

TTD resulted in an award of $1929.76 .  So here the lies of Ms.

Ribadeneira cost me the amount of Mr. Bernard's fees or $643.25 .

I do realize I got the benefit of keeping the industrial claim

open, and that in turn got me some prescription benefits although

I am rightfully entitled to that benefit.  Evidence Subsection

five, page 7, shows the award for wrongfully suspended TTD and

its disbursement.  The award of $1929.76 represents the

wrongful withholding of four bi-weekly checks of $482.44 .  But

why is there no award for medical expenses I lost during this

two months?  Sedgwick paid the TTD they clearly owed, and only

because the Ribadeneira lie was no fault of my own, but Mr.

Bernard failed to get a written statement that medical treatment

was to resume, so then as surgical infection destroyed my body

in 2011, and continues into 2012, and even now, the medical

paper result was a cluster of six Appeals.  I should win all of

11

1 | these Appeals by the fact of the Ribadeneira lie.

2 | Amazingly, there is even yet another wrinkle to Ms.

3 | Ribadeneira's setting of medical appointments.  It does not

4 | change the clarity of her malicious intent to have set medical

5 | appointments without my knowledge, and it actually proves beyond

6 | a doubt her malicious intent.  If you examine Evidence Subsection

7 | three, there's a small but important address error in my address.

8 | The proper street address of my residence is spelled "Hensley".

9 | The letter from Field Case Nurse Kathleen Hartmann is typed

10 | "Hinsley" for the street address.  I did not receive Nurse

11 | Hartmann's letter at my mailbox.  A family eight blocks away from

12 | my residence recognized my last name from the fact that they had

13 | adopted a kitten from my divorced sister, and they brought the

14 | Hartmann letter to my sister personally, because they are kind

15 | people they wanted to again thank my sister for the sweet cat,

16 | and talk cat stuff.  I was not aware of an error in my address

17 | from Sedgwick, because TTD checks from Sedgwick were correctly

18 | addressed and they tended to arrive in about a week or slightly

19 | later.  I was able to tell Field Case Nurse Hartmann my corrected

20 | address but apparently she did not convey that knowledge to

21 | Ms. Ribadeneira.  Now the conclusion of whether I could have even

22 | have received notice of medical appointments is that if Ms.

23 | Ribadeneira had sent something to me by Fed-EX, then it might

24 | have arrived at my residence and she would have had proof.

25 | If Ms. Ribadeneira had sent USPS notice of medical appointments

26 | to me by letter with proof of mailing, then she would have had a

STEVEN HICKS   PRO SE   3475 HENSLEY   RENO NV 89503   (775) 747 - 4473

1  small white stamped certificate that would show where something

2  was mailed.  If Ms. Ribadeneira had even placed a notice of

3  medical appointments into the mail with a stamp, then the "cat

4  friends" could have received the wrongly addressed letter as

5  before and then brought it to me via my sister  (The "cat

6  friends" have actually become more like family friends and they

7  can attest of no more Sedgwick letters to me at their home).

8      Sedgwick / Wal-Mart had no choice to resume TTD after the

9  admitted lie of Ms. Ribadeneira.  To say my surgery with Dr.

10  Petersen was without authorization or written request is simply

11  out of their jurisdiction because there is no Nevada

12  Administrative Codes or Nevada Revised Statutes (that I know of)

13  to reflect a situation like mine where a claims adjuster

14  deliberately lied to intentionally harm an industrial claimant.

15  There's no NRS for how to request authorization when you are

16  already severed, because traditionally severed means severed.

17  Sedgwick is certainly not going to provide guidelines to resume

18  medical care, even though it was solely their fault.  The fact

19  that they resumed TTD is because they had no choice otherwise.

20  Somehow people like Ms. Ribadeneira, working in these positions

21  are free of liability for their mistakes / evil intentions.  My

22  position with the Ribadeneira lies of missed medical appointments

23  is much like a person who has been wrongly incarcerated for a

24  crime he or she did not commit, later duly exhonorated of the

25  original crime, but not released because of pending punishment

26  for failing to make a bed daily, or for some other small

13

1  contrived infraction.

2

3       Subsection six is only correct for date and Renown hospital.

4  In the course of my industrial injury, abdominal infection has

5  been a stubborn surgical complication.  I had fever, vertigo, a

6  soaring white count, and a large right abdominal (inguinal) mass.

7  The ambulance was called because there was some respiratory

8  distress. An ambulance truly represents an emergency, not choice.

9  REMSA is emergency medical service and so no choice is given, and

10 no other options are available except to refuse medical care and

11 risk death.  Evidence of this is the Prehospital Care Report

12 Summary of REMSA (see Evidence Subsection six).  The words

13 non-emergent, unrequested, and unauthorized are totally improper

14 and misleading in relation to an emergency hospitalization.

15

16      Subsection seven almost has too many errors to begin to

17 attempt to correct.  The phrase "verified a complex fluid

18 mass" is wrong because it would require a medical (needle) biopsy

19 to be truly "verified" and that procedure was not done.  The

20 second major error of Subsection seven is the word "right

21 testicle" I admit to sometimes using the word testicle and

22 testis interchangeably, but specifically what is wrong here is

23 neither the testicle nor testis was the correct body part.  I

24 will say that all of my medical treatment fits within the

25 parameters of abdominal or pelvic.

26

14

1    Subsection eight is a mess, to sum it up briefly.  The first

2  problem with Subsection eight is Subsection seven wrote "complex

3  fluid mass" and now Subsection eight writes "cystic mass" .  The

4  words "mass" are similar in both subsections but somehow I am

5  quite dissatisfied with this error between these Subsections.

6  Just using the word "mass" so loosely, for all I know as a common

7  person being steamrolled in an unforgiving Sedgwick / Wal-Mart

8  framework, this word "mass" could also mean Roman Catholic mass.

9  I am not trying to be a smart-ass here about this "mass" word; I

10  have been made a victim with a lost testis, victimized with

11  dealing with a "Benavidez lie", victimized with dealing with a

12  "Ribadeneira medical appointments lie", and further burdened with

13  being left with more unpaid medical bills than I will be able to

14  repay in the remainder of my natural life.  Sedgwick / Wal-Mart /

15  Mr. Benavidez would know which "mass" it was if they were to be

16  held responsible for the medical complications arising from my

17  industrial injury.  Again, like in Subsection seven, an error in

18  Subsection eight is that "right testicle" is the wrong body part.

19  If Dr. Stumpf could speak of subsection eight, he would say he

20  done no surgery on or at the right testicle.

21

22    Subsection nine is by far the biggest disaster of all the

23  subsections.  The first three words "A testicular ultrasound",

24  is wrong because medical professionals do not cut a testis out of

25  a scrotum and then do an ultrasound.  I think the correct term

26  meant here is "Scrotal ultrasound" but I should not be having to

STEVEN HICKS  PRO SE  3475 HENSLEY  RENO NV 89503  (775) 747 - 4473

15

guess meanings of sentences.  The "dated August 29, 2011" is
quite suspicious.  Would someone here want to plead that there is
a typographical error of some sort?  I do not readily recognize
"August 29, 2011".  I see the sickening chant of "verified an
atrophic left testicle" ( the Benavidez lie) and I wonder if the
repetition has some implied meaning that it is there to confuse
my Appeals Officer Ms. Gallagher or to imply that it simply has
not regenerated, when this tissue simply never regenerates.
The words "right hydrocele" belong nowhere near this date: the
hydrocele was a surgical complication of 2010 and that hydrocele
has long since been absorbed into my body by mid 2011.   Maybe
this IS the actual intent of Mr. Benavidez to totally confuse
another person and even embarass them into not asking questions.

Subsection ten is going to be a big headache for someone
other than myself.  I am not at liberty to speak of it, pending
some responses from both Federal and State officials.   A fair
and impartial person with a legally-skilled mindset might be able
to read the page "Evidence Subsection three" and see the problem
in relation to Dr. Freeman.

To quickly conclude my "Findings of Fact" of my Exhibit ONE,
"Before the Appeals Officer", there is not one Subsection that is
correct or factual.  The signature of Appeal Officer Ms.Gallagher
should not be on this document because even if she were
deliberately confused by lies of Mr. Benavidez, she has a duty to

16

1  ask questions and discover actual real facts.  If this had been

2  even partially done I could have been satisfied to accept less

3  than the full benefits I deserve.  When I have discussed the

4  Ribadeneira medical appointments lie, and the proof of

5  Sedgwick's admission of it, of course Mr. Benavidez is going to

6  omit and do anything and everything to conceal this from the

7  Appeals Officer.  Going into an industrial injury claim, on an

8  emergency basis, I expected and needed experienced and

9  quality medical care, prescriptions, and Temporary Total

10  Disability (TTD) to allow me to get back into the work force.

11  Instead, I got a doctor that failed the surgery, an insurance

12  company that has prolonged or denied benefits and desired to

13  sever all liability, and for myself a permanent partial

14  disability.  It is a fact that has been deliberately avoided in

15  the "Findings of Fact" that a Functional Capacity Evaluation

16  (FCE) was done on June 9, 2011, and I have serious physical

17  limitations that are documented by a Nevada licensed Physical

18  Therapist.

19

20

21                    **FACT OF MATH - LEFT TESTIS**

22

23      I have a copy of my scrotal ultrasound done in July 9, 2010

24  at Reno Open Air MRI (ROAM).  It is Evidence Subsection four.

25  When the radiologic films are held up to a bright light, there is

26  computer generated data at the margins of the views.  In some of

17

1   my complaint prepared for District Court, I have mentioned that
2   there is 96 percent damage to my left testis, damage done to me
3   by Dr. Sasse neglecting to attend to my hydrocele in 2010 and
4   occurring as a result of my industrial injury of 4 May 2010.
5   Data in the margins of Left Teste views are W = 2.03 cm,
6   L = 1.03 cm, and H = 1.09 cm . Data for the Right Teste is
7   W = 3.87 cm, L = 5.14 cm, and H = 2.96 cm.  Cubic centimeters is
8   determined by multiplying Length times Width times Height.  In
9   that manner, the cubic centimeters are calculated.  Left cubic
10  centimeters are 2.279081 and Right cubic centimeters are
11  58.879728.  The percent decrease can be calculated by deducting
12  a difference of cubic centimeter values and then dividing.
13  2.279081 is to be subtracted from 58.879728 to result in
14  56.6518199.  When 56.6518199 is divided by 58.879728, the result
15  is 0.9621617120921483 .  Percent decrease means that two decimal
16  places are moved to the right.  My Left Testis had a 96.2 percent
17  decrease by volume.  I guess Mr. Benavidez would be anxious to
18  point out that there is a remaining 3.8 percent, or perhaps my
19  loss was not a complete loss.  To me, and to most reasonable
20  people, loss of 96.2 percent of something is what is called a
21  virtual loss.

22

23                              **DEMAND**

24  Demand 1: Mr. Benavidez should provide a written apology for what
25  I have called the "Benavidez lie".  This was the lie about prior
26  atrophy of the left testicle in the year 2000.  The apology is to

18

be delivered to all parties to this claim, with two extra copies,

each, to be delivered to both the State of Nevada, Department of

Administration, both to the Hearings Office and also to the

Appeals Office (this is a total of four copies to the State of

Nevada). Should Mr. Benavidez choose not to comply with apology,

and then certainly my proper Standard of Care was violated, then

I ask for triple consideration of equal value to the lost left

testicle. The triple value is to be monetary, but should properly

accompany a statement that it is done in the contradiction

of licensed professional doctors and nurses. This apology

must be done no later than forty-five days of the filing of this

document because I have currently scheduled surgery to my abdomen

and/or pelvis region. If Mr. Benavidez selects to write of my

violation of Standard of Care, that choice should be made within

thirty (30) days to enable me a narrow 15 days to prepare a

counter statement.

Demand 2: Mr. Benavidez will issue a statement about his

error to allege right testicle masses, right testicle surgery,

and whatever right complex fluid mass and whatever cystic mass

as he has done in "Before the Appeals Officer", in the portion

"Findings of Fact" and specifically in Subsections seven and

eight. I am adamant about the full and complete fulfillment of

demand 2 in its entirety and exactly as I have specified

otherwise another *deceiver* could access this wrong document and

19

1  misuse it to imply I was also having right testicle problems.

2  As I have stated, no surgery was done to the right

3  testicle: I am adamant to protect myself against further lies

4  like the left testicle Benavidez lie. This statement of error

5  will be provided to all parties to this claim, and with two extra

6  copies, each, to be delivered to both The State of Nevada,

7  Department of Administration, both to the Hearings Office and

8  also to the Appeals Office (this is a total of four copies to the

9  State of Nevada). Additionally, Mr. Benavidez is to pay for a

10  Medical Doctors' statement that my right testicle is healthy and

11  there is no evidence of surgery to my scrotum. This examination

12  is to be done within thirty (30) days of the filing of this

13  document with Mr. Benavidez's payment to that doctor within

14  forty-five (45) days of this filing.

15

16  Demand 3: Mr. Benavidez will produce whatever document he is

17  referencing in Subsection nine, (which reads) "A testicular

18  ultrasound dated August 29, 2011 verified an atrophic left

19  testicle, a left varicocele, and right hydrocele." Because there

20  is something erroneous with this statement, I reserve the right

21  to later demand its correction, and have up to thirty days to

22  correct it to my satisfaction. Mr. Benavidez will provide this

23  document to my mailing address within fifteen (15) days of

24  this filing and also provide it for the scrutiny of the Court of

25  filing.

26

STEVEN HICKS  PRO SE  3475 HENSLEY  RENO NV 89503  (775) 747-4473

1  <u>Demand 4</u>: Appeals Officer Ms. Gallagher will acknowledge at least

2  one of the many profound lies referenced in this document, and

3  she may graciously choose to comment as she sees fit, as she may

4  no longer have jurisdiction, she should not be placed in

5  embarassment or any sort of punishment because I believe she had

6  good intentions.  I know she received a plethora of lies and

7  bountiful significant omissions, and this was more than anyone

8  could be expected to sort in a limited time.

9

10  <u>Demand 5</u>: Monetary Damages.  I acknowledge my claim of a lost

11  testicle is a claim where no businessman in Nevada can spend

12  $85,000. to defend a case that is possibly worth maybe $97,000.,

13  and so I am beginning a pro se District Court Petition for

14  Judicial Review informa pauperis (IFP).  I feel that Medical

15  Bankruptcy is simply not appropriate for me as I was injured

16  doing as I was directed to do, by a supervisor, and, to my

17  knowledge, Wal-Mart has paid their SIIS premiums.  I do not know

18  the medical value of a lost testicle, but it should be at least

19  equal to the cost of a prosthetic testicle.  A Sacramento

20  Urologist who knows my case has suggested to me that, pending

21  choice of prosthetis, a good ballpark estimate of the value of

22  this surgery is $13,800.  Ninety-six percent of $13,800. is

23  $13,248.  This option is available to me only when I have had

24  three months of White Blood Count and Neutrophils (blood work)

25  that do not indicate infection.  My Blue Cross Blue Shield

26  personal insurance or my own personal cash has paid for all

STEVEN HICKS   PRO SE   3475 HENSLEY   RENO NV 89503   (775) 747 - 4473

21

1  surgeries except the initial surgery done by Dr. Sasse.  This
2  means that I have paid the full out-of-pocket BCBS $5,000. per
3  year for the years 2010, 2011, and 2012 (I have paid Leave Of
4  Absence premiums of over $100. a month to Wal-Mart to continue
5  my private health care, but I am not asking reimbursement of
6  this).
7  OOP BCBS 2010, 2011, and 2012   .   .   .   .   .   .   .   $ 15,000.
8  Las Vegas explant of surgical mesh, 2010 .   .   .   .   $  6,987.
9  Las Vegas rental car/wheel chair, food, hotel  .   .   $    775.
10 Return of TTD related to Ribadeneira lie .   .   .   .   $    643.25
11 2012 offer of nuisance settlement for full body
12 damage to Right Inguinal Hernia – this includes
13 a vocational rehabilitational buyout                    $ 30,000.
14 Estimate of cash cost of next Las Vegas surgery .   .   $  7,000.
15 Estimate of Las Vegas expenses   .   .   .   .   .   .   .   $    775.
16 Value of left testicle prosthesis, reduced to 96%  .   $ 13,248.00
17 Abdominal bandages and antiseptic not
18 paid by BCBS (home care expenses)  .   .   .   .   .   .   $    318.12
19 subtotal                                        =============
20                                                 $ 74,733.37
21 I have had to pay Mr. Bernard fees of
22 forty percent to keep the claim open (40% of the subtotal)  .   .   $ 29,893.34
23 FINAL TOTAL                                     =============
24                                                 $104,626.71
25
26

22

Demand 6:   Dr. Sasse done my initial inguinal hernia surgery.
Dr. Lasko, my initial pain management doctor, writes of my
diagnosis of ilioinguinal neuralgia in Evidence Subsections
one, three, four, and five.  Evidence Subsection four is
dated October 26, 2010.  I have found physician notes of my
initial visit to Dr. Lasko, which occurred on August 31, 2010.
This note is the earliest note of ilioinguinal neuralgia, and
I emphasize it because it precedes any other surgery that I have
had.  Mr. Benavidez had tried to make a bad point to my attorney
that with nerve damage and infection, and that with multiple
surgeries, that other surgeons should bear blame for my
condition.  This was a futile attempt to sever all liability
by Sedgwick.  The initial visit to Dr. Lasko is designated
"Evidence Demand Six" and it specifically diagnoses ilioinguinal
neuralgia (third line of "History of the Present Complaint").
The truth of ilioinguinal neuralgia is that once it is created by
an infected Bard PerFix Plug and Mesh Overlay, no surgeon can do
anything to change its course, short of amputation, which is not
compatible with life.  I will need continual and uninterrupted
medical care of this nerve damage for the rest of my natural
life.  This current incident of loss of medical care has begun in
November 2011 and it continues into May 2012 with no resolution
in sight if Mr. Benavidez should choose to prolong avoidance of
Sedgwick responsibility.  I see no decent solution but the
establishment of a medical care payment trust, in favor of
myself, in order to pay doctor visits and costly prescriptions.

23

1  Sedgwick CMS

2  PO Box 34660                          **LIST OF PARTIES**

3  Las Vegas,  NV  89133                 **OTHER THAN MYSELF**

4

5  David Benavidez, ESQ

6  850 S. Boulder HWY 375                 JURY  SHALL

7  Henderson,  NV  89015                  BE  DEMANDED.

8

9  Wal-Mart

10  PO Box 1288

11  Bentonville, AR  72712

12

13  Lawrence Bernard, ESQ

14  3690 Grant Dr. STE LBB

15  Reno NV 89509

16

17  State of Nevada

18  Department of Administration

19  1050 E. Williams Street STE 450

20  Carson City, NV 89701

21

22  Dated this 21st day of May, 2012.      _Steven Hicks_____

23                                         STEVEN HICKS _litigant pro se_

24                                         Claimant / Plaintiff

25

26

(775) 747 - 4473   RENO NV 89503   3475 HENSLEY   PRO SE   STEVEN HICKS

**BEFORE THE APPEALS OFFICER**

In the Matter of the Contested )
Industrial Insurance Claim )   Claim No: 6068580

                           )
          of               )   Appeal No:   34285-DSG
                           )                34725-DSG
STEVEN HICKS,              )                34839-DSG
                           )                36343-DSG
          Claimant.        )                37656-DSG
                           )                38175-DSG
_____)

**FILED**
APR 1 8 2012
DEPT. OF ADMINISTRATION
APPEALS OFFICER

**DECISION AND ORDER**

On March 20, 2012, the appeals were considered by Appeals Officer Deborah S. Gallagher. Sedgwick/Wal-Mart (Insurer/Employer) was present by and through David H. Benavidez, Esquire. Steven Hicks (claimant) was present and was represented by Lawrence Bernard, Esquire.

The first issue on appeal relates Hearing Officer decision dated March 4, 2011, which affirmed Sedgwick's defacto denial to reimburse the claimant for a November 23, 2010 right hernia surgery, denial of medical bills and denial of temporary total disability (TTD). The Hearing Officer noted the claimant would re-submit the bill for the May 10, 2010 $14.54 prescription. Claimant's counsel clarified the TTD issue and reimbursement of the $73.99 prescription was resolved and could be dismissed. (34285-DSG).

The second issue on appeal relates to the Hearing Officer

THE LAW OFFICE OF DAVID H. BENAVIDEZ
850 S. BOULDER HIGHWAY, # 375
HENDERSON, NEVADA 89015
(702) 565-9730
FAX (702) 568-1301

( EXHIBIT ONE )

decision dated April 5, 2011, which dismissed the claimant's January 12, 2011 request to reimburse for the November 23, 2010 surgery as the issue was res judicata.   (34725-DSG)

The third issue on appeal relates to the Hearing Officer decision dated April 5, 2011, which dismissed the claimant's February 3, 2011 request to approve a prescription, as the insurer authorized it.   (34839-DSG).

The fourth issue on appeal relates to the Hearing Officer decision dated August 4, 2011, which affirmed Sedgwick's June 28, 2011 and July 8, 2011 denial of payment for medical care at Renown Regional on June 10, 2011 for $3876, June 10-15, 2011 for $47,537, Reno Radiological on June 10, 2011 for $227, 369.45, $68, June 11, 2011 for $601.98 and June 12, 2011 for $692.   (36343-DSG).

The fifth issue on appeal relates to Hearing Officer decision dated November 16, 2011, which affirmed Sedgwick's September 13, 2011 denial to reimburse the claimant for the July 21, 2011 surgery to remove a necrotic hematoma from the right groin. (37656-DSG).

The sixth issue on appeal relates to the Hearing Officer decision dated December 28, 2011, which reversed Sedgwick's November 21, 2011 determination severing liability for the claim due to non-industrial treatment and denial of future vocational

THE LAW OFFICE OF DAVID H. BENAVIDEZ
850 S. BOULDER HIGHWAY, # 375
HENDERSON, NEVADA 89015
(702) 565-9730
FAX (702) 568-1301

- 2 -

EXHIBIT ONE

rehabilitation services (38175-DSG).

Having considered the arguments of counsel, the testimony of the claimant, and having reviewed the evidence on file, the Appeals Officer hereby finds and concludes as follows:

**FINDINGS OF FACT**

1. On May 2, 2000, the claimant was examined by his private physician Capurro relating to right lower abdominal pain of unknown etiology. Dr. Capurro noted a prior varicocele. Dr. Capurro ordered a scrotal ultrasound which verified an atrophic left testis with a small varicocele.

2. On May 3, 2010, the claimant sustained a right inguinal hernia while employed by Wal-Mart. On May 4, 2010, Dr. Sasse repaired the hernia.

3. By determination dated June 22, 2010, Sedgwick accepted the right inguinal hernia.

4. A testicular ultrasound dated July 1, 2010 verified an atrophic left testicle and a left varicocele.

5. The claimant was under the care of pain specialist Lasko in Reno, Nevada. On November 23, 2010, without prior authorization or any written or verbal request, and on a non emergent basis, the claimant reported to Dr. Peterson in Las Vegas, Nevada and had right inguinal surgery on a cash basis.

- 3 -

THE LAW OFFICE OF DAVID H. BENAVIDEZ
850 S. BOULDER HIGHWAY, #375
HENDERSON, NEVADA 89015
(702) 565-9730
FAX (702) 568-1301

EXHIBIT ONE

6.    On June 10, 2011, under the private insurance, the claimant reported for non-emergent, unrequested and unauthorized medical care with Renown Regional.

7.    On June 21, 2011, Dr. Capurro recommended an ultrasound which verified a complex fluid mass in the right testicle.    On July 11, 2011, the doctor referred the claimant for a surgical evaluation.

8.    On July 21, 2011, without prior authorization or any written or verbal request, and on a non emergent basis, Dr. Stumpf surgically removed the cystic mass in the right testicle.

9.    A testicular ultrasound dated August 29, 2011 verified an atrophic left testicle, a left varicocele and right hydrocele.

10.   On November 17, 2011, under the private insurance, Dr. Freeman surgically repaired the left varicocele.

**CONCLUSION OF LAW**

Based on the totality of evidence, the Appeals Officer concludes that Sedgwick has no liability for the medical treatment and resulting medical bills noted above.   The treatment noted above was not authorized by Sedgwick.  Neither the claimant or any of the above providers requested authorization from Sedgwick.  The medical care, resulting conditions and medical billing are therefore not the responsibility of Sedgwick. Liability on the

- 4 -

THE LAW OFFICE OF DAVID H. BENAVIDEZ
850 S. BOULDER HIGHWAY, # 375
HENDERSON, NEVADA 89015
(702) 565-9730
FAX (702) 568-1301

EXHIBIT ONE

1  claim was not severed because of the above-mentioned medical

2  treatment.

3                                **ORDER**

4

5       The Hearing Officer decisions dated March 4, 2011, April 5,

6  2011, August 4, 2011, November 16, 2011 and December 28, 2011 are

7  affirmed.

8            Dated this _16^th_ day of __April__, 2012.

9

10

11            _____
              DEBORAH S. GALLAGHER, ESQUIRE
12                   APPEALS OFFICER

13                **NOTICE OF APPEAL RIGHTS**

14

15       Pursuant to NRS 616C.370 and NRS 233B.130, should any party
    desire to appeal this final determination of the Appeals Officer,
16  a Petition for Judicial Review must be filed with the District
    Court within thirty (30) days after service by mail of this
17  decision.

18
    Respectfully submitted,
19

20  _____

21  DAVID H. BENAVIDEZ, ESQUIRE

22

23

24  

25

26

27

28

THE LAW OFFICE OF DAVID H. BENAVIDEZ
850 S. BOULDER HIGHWAY, #375
HENDERSON, NEVADA 89015
(702) 565-9730
FAX (702) 568-1301

## CERTIFICATE OF MAILING

The undersigned, an employee of the State of Nevada, Department of Administration, Hearings Division, does hereby certify that on the date shown below, a true and correct copy of the foregoing **Decision and Order** was deposited into the State of Nevada Interdepartmental mail system, **OR** with the State of Nevada mail system for mailing via United States Postal Service, **OR** placed in the appropriate addressee runner file at the Department of Administration, Hearings Division, 1050 E. Williams Street, Suite 450, Carson City, Nevada, 89701 to the following:

STEVEN HICKS
3475 HENSLEY ST
RENO, NV 89503

LAWRENCE BERNARD, ESQ
3690 GRANT DR STE LBB
RENO NV 89509

WAL-MART
PO BOX 1288
BENTONVILLE, AR 72712

DAVID BENAVIDEZ, ESQ
850 S BOULDER HWY 375
HENDERSON NV 89015

SEDGWICK CMS
PO BOX 34660
LAS VEGAS, NV 89133

Dated this _11_ day of April, 2012.

_Tasha Eaton_
Tasha Eaton, Supervising Legal Secretary
Employee of the State of Nevada



This report was printed from PowerChart at Saint Mary's Health Network

# H & P

**HICKS, STEVEN P - 043-93-49**

| | |
|---|---|
| Result type: | H & P |
| Result date: | May 04, 2010 8:23 AM |
| Result status: | Auth (Verified) |
| Result title: | hp |
| Encounter info: | 6350679, Saint Mary's, Ambulatory Surgery Center, 5/4/2010 - 5/4/2010 |

**hp**
NAME: Hicks, Steven P
MR #: 00-043-93-49
ADMISSION DATE: 05/04/201

*(handwritten stamp: EVIDENCE page one SUBSECTION ONE)*

CHIEF COMPLAINT
Right groin mass.

HISTORY OF PRESENT ILLNESS
Mr. Hicks is a 52 - year-old male who describes that he was pushing a shopping cart at work today when he felt a pop and a bulge in his right groin and this has been painful and non-reducible. He has had no vomiting, but has had a persistent bulge and presented to the Emergency Room where the bulge was non-reducible. He has had no fevers or chills, no previous known hernia in the groins. He has had a remote umbilical or ventral type hernia that was repaired with mesh in what he believes was 1991. The pain is in the right groin. There is no abdominal pain or nausea.

PAST MEDICAL HISTORY
1. Obesity with significant intentional weight loss, improved.
2. Hypertension, improved with weight loss.
3. Umbilical hernia repair with mesh in 1991.
4. Gout.

MEDICATIONS
Aspirin.

ALLERGIES

SOCIAL HISTORY
He works as a cashier at Wal-mart. He did not use tobacco or alcohol. He is unmarried.

FAMILY HISTORY
He has no children or siblings, describes that his parents are alive. There is hypertension in the family. No known family history of inflammatory bowel disease or colorectal cancer.

REVIEW OF SYSTEMS
NEUROLOGIC: Denies strokes or seizures.
CARDIAC: No chest pain or palpitations. Did have hypertension in the past but this is improved with weight loss.
LUNGS: Denies coughing, wheezing or hemoptysis. No tobacco.
GASTROINTESTINAL: Denies chronic gastrointestinal illnesses, hematemesis or rectal bleeding.
GENITOURINARY: Denies dysuria, hematuria, and nephrolithiasis.
MUSCULOSKELETAL: Denies fractures of arthritides.
PSYCHIATRIC: Denies anxiety, depression or phobias.
EYES: No recent visual changes.

| | |
|---|---|
| Printed by: | Junas , Joy L |
| Printed on: | 9/22/2010 1:13 PM |

This report was printed from PowerChart at Saint Mary's Health Network

# H & P

HICKS, STEVEN P - 043-93-49

ENDOCRINE:  Denies diabetes or thyroid disorder.

PHYSICAL EXAMINATION
IN GENERAL: He is comfortable, nontoxic, in no acute distress.
VITAL SIGNS:  Height is 70 inches, weight 100 kg. Body Mass Index 31.6.
Afebrile. Temperature 98.3, pulse 82, blood pressure 162/90.  Room air
saturation 99%.
HEENT:  Eyes are anicteric.  Extraocular movements are intact.  Wearing glasses.
Oropharynx is clear.
NECK:  Supple. Good range of motion.
CHEST:  Clear to auscultation.
CARDIOVASCULAR:  Regular rate and rhythm.
ABDOMEN:  Obese, soft, nontender.  Healed umbilical scar.
GROINS:  There is a non-reducible right groin mass consistent with incarcerated
right inguinal hernia.  Scrotum, testes and phallus within normal limits.
EXTREMITIES:  Warm and acyanotic.  No edema.
NEUROLOGIC:  Nonfocal. Normal power and strength throughout. Mood, affect and
judgment appear within normal limits.

LABORATORY STUDIES
Notable for potassium of 3.3, white blood cell count 10.

IMPRESSION
1. Right groin pain and bulge.
2. Incarcerated right inguinal hernia.
3. Obesity.
4. Hypokalemia.
5. History of hypertension and gout.

PLAN
I talked at length with Mr. Hicks about the nature of his symptoms and the
nature of the findings.  We discussed the rationale, pros, cons, risks and
alternatives of an urgent right groin exploration with repair of incarcerated
right inguinal hernia. We discussed the risks including bowel surgery, abdominal
surgery, hernia recurrence, infection, bleeding, groin pain, neuropathy,
numbness, pain syndrome, testicular or scrotal complications, orchiectomy,
scrotal pain syndromes, wound problems, hernias, dehiscences, heart, lung,
liver, kidney or other organ dysfunction, disability, bowel, bladder, ureteral,
spermatic cord or other injuries, fistula, abscess, re-operation, disabilities
and death.

His questions were answered in full. He understands and wishes to proceed ahead.
We will plan to perform repair with placement of mesh with an open technique.

EVIDENCE Page 2
SUBSECTION ONE

Kent C. Sasse, M.D.

KCS/mb Job #:000017612
D: 05/04/2010  4:45 A
T: 05/04/2010  8:09 A
cc:   Colleen O'Gara-Capurro, M.D.
      Kent C. Sasse, M.D.

MEDICAL DISTRICT SURGERY CENTER
2020 GOLDRING AVE., SUITE #300
LAS VEGAS, NEVADA 89106

### OPERATIVE REPORT

EVIDENCE SUBSECTION TWO PAGE ONE

**DATE OF OPERATION:**  11/23/10

**PREOPERATIVE DIAGNOSIS:**
1.   Intractable and incapacitating right groin pain secondary to hernia mesh.

**POSTOPERATIVE DIAGNOSIS:**
1.   Intractable and incapacitating right groin pain secondary to hernia mesh.

**OPERATIONS PERFORMED:**
1.   Exploration and removal of right groin mesh.
2.   Right inguinal herniorrhaphy.

**ANESTHESIA:** General.

**DESCRIPTION OF PROCEDURE:**
The patient was taken to the operating room and placed in the supine position. After induction of general anesthesia, the right groin was shaved, prepped, and draped in the usual sterile fashion. Then, 0.25% Marcaine with epinephrine was used to infiltrate the skin incision site as well as create a field block by injecting lateral to the intended incision. An oblique skin incision was made in the inferior fold of the panniculus directly over the inguinal region. The subcutaneous tissue was divided with electrocautery down to the external oblique fascia. Before reaching the external oblique fascia, there was noted to be dense reactive scar tissue which was tethering the patient's spermatic cord and the abdominal fascia to the symphysis pubis. These adhesions were taken down which facilitated exposure of the spermatic cord and reduced tension on the cord. Examination of the layers of fascia identified the patient's mesh plug and the onlay patch which again was noted to have an intense inflammatory reaction around the foreign material. This was consistent with the patient's complaints of severe chronic pain since the mesh was originally placed. The external oblique fascia was divided along its fiber course exposing the onlay patch. The onlay patch was then dissected from lateral to medial coming upon the mesh plug. The mesh plug was noted to be just superior to the spermatic cord and the spermatic cord structures were easily kept out of the field of dissection. With exposure of the mesh plug, there was identified some purulent fluid which appeared to be a sterile abscess most likely again consistent with the inflammatory process directed at the foreign material. The plug and the onlay mesh were successfully freed from the surrounding fascia and muscle. There was noted to be no evidence of a direct hernia. However, it was felt that there was likely an indirect hernia due to the dilated nature of the internal ring. The floor of the inguinal canal was then repaired in the manner of McVay suturing Cooper's ligament to the transversalis fascia. Transition stitch was placed at the level of the femoral vessels going from the shelving edge of the inguinal ligament

**PATIENT NAME:**  HICKS, STEVEN
**ACCOUNT NUMBER:**  120671
**SURGEON:**  Kevin C. Petersen, M.D.
**PAGE 1 OF 2**

## OPERATIVE REPORT

to the transversalis fascia. The internal ring was closed tight enough to admit the tip of an instrument alongside the spermatic cord with the final three stitches being lateral to the spermatic cord. The external oblique fascia was closed with a running 3-0 Vicryl suture. The anterior fascia over the rectus abdominis muscle medially was identified as being opened and this was closed with a running 2-0 PDS suture. The subcutaneous tissue was closed with interrupted 3-0 Vicryl. The skin was closed with a running subcuticular using 4-0 Monocryl suture. Dry sterile dressings were placed. General anesthesia was reversed. The patient was returned to the recovery room in satisfactory condition.



_____
Kevin C. Petersen, M.D.
KCP/SN/snksmt19/10298148
D: 11/23/2010 07:43 p
T: 11/24/10 07:00 A

PATIENT NAME:   HICKS, STEVEN
ACCOUNT NUMBER:  120671
SURGEON:   Kevin C. Petersen, M.D.
PAGE 2 OF 2

 **Health Systems International**

Formerly Bass & Babb Companies

133 West Washington
Osceola, IA 50213
1.800.342.7205
www.us-hsi.com

Kathleen Hartmann, RN, BSN, CCM, CLCP
**P.O. Box 10766
Reno, NV. 89510
(775) 225-7436 phone
(530) 582-9963 fax**

July 28, 2010



Steven Hicks
3475 Hinsley Street
Reno, NV. 89503

Dear Mr. Hicks:

As an introduction, I am a nurse case manager whom will be assisting you with your transfer of care to an urologist to evaluate your current difficulties following hernia surgery.  The appointment is scheduled as follows:

Date      :      August 3, 2010
Time     :      Check in at 10:30 appointment at 11:00 a.m.
Location:      Dr. John Freeman, MD
                    Urologist
                    10745 Double R Blvd
                    Reno, NV.  89521
                    (775) 850-6500

Please call and confirm your appointment with Dr. Freeman.  If you have any questions, please do not hesitate to call me.

Best Regards,

Kathleen Hartmann, RN, BSN, CCM, CLCP
Field Case Manager

EVIDENCE
SUBSECTION
THREE   page 2

US POSTAGE
$00.44
05/06/2011

Postage
00000000000
1272776

FIRST CLASS

ADDRESS
SERVICE
REQUESTED

5/10/2011

8550620098 0063

EVIDENCE
SUBSECTION
THREE
page 3

Sedgwick CMS - Wal-Mart WC
P.O. Box 1288
Bentonville, AR 72712-1288

Steven Hicks
3475 Hensley St
Reno, NV 89503

Claim Number:              6068560
Claimant Name:             Steven Hicks
Service/Indemnity From:    05/10/2010   Thru:   05/10/2010
Insurance Company:         American Home Assurance
Comments:  Rx

Check No.:  10342451
Invoice No.:
Vendor Tax ID No.:
Invoice Comments:  Rx

Check Amount:  $ 14.54
Coverage:

⌐ DETACH AT PERFORATION. ⌐





**ROAM**
Reno OpenAir MRI
and Diagnostic Imaging Center

500 Damonte Ranch Parkway, Suite 765, Reno, NV 89521
(775) 851-7626   fax: (775) 851-7635

**NAME:** HICKS, STEVEN **DOB:** 11/13/57        **DATE:** 07/09/10

**DR:** KEN SASSE, M.D.        **RECORD:** 10314     **SS#:**

## SCROTAL ULTRASOUND

**HISTORY:**
Atrophy of the left testis, pain on the right.

**FINDINGS:**
Consistent with patient's given history there is decrease in size of the left testis, which measures, at most up to 2.3 cm. Intratesticular blood flow is documented. There is suspected varicocele.

The right testis measures up to 5.0 cm maximally. Intratesticular blood flow is documented.

There is suspected hydrocele and suspected cyst in the inferior epididymis, which measures up to 4 mm. Hydrocele is moderately large in degree.

Calcification is seen in the inferior portion of the right testis. If symptoms persist, short interval follow-up may be considered to assess for stability.

**IMPRESSION:**
1.      Atrophic left testis.
2.      Right sided hydrocele, calcification and epididymal cyst.

J.C. Taitano, M.D.
Radiologist

JCT/hmb
T:07/12/2010

**THANK YOU FOR THE REFERRAL OF YOUR PATIENT.**



ASSOCIATED
# Anesthesiologists
O   F   R   E   N   O

PAIN MANAGEMENT FOLLOW-UP NOTE:

PATIENT:   HICKS, STEVEN

DATE:        June 7, 2011

HISTORY:  Steven returns in followup for a refill of Lyrica.  He suffers from ilioinguinal neuralgia following a hernia repair.  Steven was hospitalized a few weeks ago in Northern Nevada Medical Center for right lower quadrant pain.  He stated he was given Toradol during his hospitalization.  He is also complaining of testicular pain which he believes is due to testicular atrophy.  Lyrica has proven very helpful in controlling this pain, however he has had difficulty obtaining this medication.  His Workers' Comp company does not want to pay for the prescription.

In general Steven appears to be quite anxious today.  I noted his gait on the way into the office.  He appeared to be walking normally, however while in the office he appeared to have more signs of pain with movement, for example from sitting to standing.  He could not sit through our interview.  His speech was somewhat pressured.  He was unable to relax during our conversation.

I am renewing his Lyrica and increasing his dose to 150 mg t.i.d.  I have given him a three-month supply.  He has also been given cyclobenzaprine 5 mg up to three times a day.  He was also given a three-month supply of that.  Hopefully his anxiety was pain-related today.  I will see Steven in follow up p.r.n.

*Kevin F. Lasko, M.D*

KEVIN F. LASKO, M.D.

KFL/vs

EVIDENCE
SUBSECTION
FIVE   *page one*

SCANNED

JUN 1 5 2011

(775) 348-1900   300 South Arlington Avenue   Reno, Nevada 89501
(888) 388-1905 (Toll Free)   www.asanr.com



A S S O C I A T E D
# Anesthesiologists
O F     R E N O

<u>PAIN MANAGEMENT FOLLOW-UP NOTE:</u>

PATIENT:   HICKS, STEVEN

DATE:        March 08, 2011

HISTORY:  Steven was seen last week.  He returns today, one week later, to discuss Lyrica therapy. (I gave him samples of Lyrica.)  He has done quite well with reduced neuropathic pain.  He was started at 50 mg.  Presently, he is taking 150 mg per day.  He is experiencing no adverse side effects.  On one day, he experienced more acute neuropathic pain, and he took 100 mg at a time, which was very beneficial in resolving his symptoms without sedative side effects.  I am going to increase his dose to 75 mg three times per day.  His usage will be reevaluated in one month.  In general, Steven continues to be much improved from my initial evaluation back in August of 2010.  Once again I believe that the second surgery that he had was clearly helpful.  He outwardly does not appear to be so miserable.  He no longer has an ice pack in his groin.

We discussed some difficulty that he has been having with the workmen's comp company regarding appointments that were missed.  I reviewed his appointment schedule with our scheduler.  There have been no appointments that he has missed in my office.  There have been times when he was rescheduled, and I believe that that was due to a change in my schedule.  We believe the appointments that are being referred to by the workmen's comp company that Steven did not keep were appointments for functional capacity testing.  These tests were not arranged through our office.  Steven states that he was unaware of any appointments for functional capacity testing.  My scheduler suggested that Steven address this with his attorney because we have no information regarding appointments that were made for functional capacity testing.

*Kevin F. Lasko, M.D*
KEVIN F. LASKO, M.D.

KFL/cv

EVIDENCE
SUB SECTION
FIVE   page 2

S C A N N E D

JUN 1 5 2011

(775) 348-1900   300 South Arlington Avenue   Reno, Nevada 89501
(888) 388-1905 (Toll Free)   www.asanr.com



ASSOCIATED
# Anesthesiologists
O F   R E N O

## PAIN MANAGEMENT FOLLOW-UP NOTE:

PATIENT:   HICKS, STEVEN

DATE:        March 01, 2011

HISTORY:  Steven is here for followup of ilioinguinal neuralgia.  Today, Steven is very upbeat.  He no longer carries an ice pack in his groin.  The surgery that he had was clearly beneficial and has improved his condition.

Steven still complains of some intermittent sharp neuropathic spasm type pain in the inferior medial portion of his inguinal incision.  The increase in pain usually occurs after sitting for a short period of time; for example when driving to his sister's house which takes about 30 minutes; about half way, he needs to get out of the car, stretch and straighten his lower abdomen for the spasm to resolve.

During his last visit, I have prescribed Flexeril to try for the spasms.  Steven reports that this was denied by the workmen's comp company.  Recently, he has contacted an attorney to help him process claims with the workmen's comp company.

I have been informed by my office staff that Steven did not ever undergo the functional capacity testing.  Other than the intermittent pain that occurs during periods of sitting, he appears capable to return to work.  He certainly could start with light duty and then advance his activity at work as tolerated.

Steven also requested a testosterone blood test.  I asked why and he stated that he has not been feeling right for the past several weeks.  I explained that this is not my area of expertise, and he would better address this problem with a primary care physician.

Prior to leaving, I gave Steven some samples of Lyrica to be tried for the neuropathic/spasm pain in his groin.  He may need a new prescription for the Flexeril once his attorney has sorted out the problems with the workmen's comp company.

Steven will follow up p.r.n.



KEVIN F. LASKO, M.D.

KFL/cv



## A S S O C I A T E D
# <u>A</u>nesthesiolog<u>i</u>stS
### O   F   R   E   N   O

<u>PAIN MANAGEMENT FOLLOW-UP NOTE:</u>

PATIENT:   HICKS, STEVEN

DATE:        October 26, 2010

HISTORY:  Steven returns in followup for postoperative ilioinguinal neuralgia.  Steven initially had an ilioinguinal block during his first visit.  This was ineffective with any prolonged relief.  He was then started on Neurontin and increased to 2400 mg per day.  Initially, the Neurontin was effective, however, became ineffective over time.

PHYSICAL EXAMINATION:  Steven has a well-healed incision in the right groin.  There is no evidence of wound breakdown, erythema, or infection.

Steven is concerned about several issues.  He is concerned that there may be an allergic reaction to the mesh.  He is concerned that the mesh is wrapped around his spermatic cord and compromising the blood supply and function of his testicle on the right side.  He is concerned about this because he has an atrophic left testicle.  Steven complains of several areas that are described as dime-sized bulges in his right groin.  He feels that these are evidence of infection.  He is taking Keflex presently prescribed by another physician.  Also, I know Steven has an ice bag over the right groin, which he has had every time he has come into the office.

Steven and I had a long conversation regarding his symptoms and the treatments to be considered for the future.  I am going to change his Neurontin to Lyrica as well as obtain a functional capacity test to determine an objective level of function so that he can be returned to work if possible.  I made a call to his workmen's compensation representative, Leslie Ribadeneira.  She supported the change to Lyrica as well as the functional capacity testing.  I recommended that Steven seek a second opinion from another surgeon here in this community regarding the need for reoperation.  I will see Steven again in one month.

KEVIN F. LASKO, M.D.

KFL/cv





## A S S O C I A T E D
# Anesthesiologist S
### O F   R E N O

<u>PAIN MANAGEMENT FOLLOW-UP NOTE:</u>

PATIENT:   HICKS, STEVEN

DATE:        January 04, 2011

HISTORY:  Steven returns in followup for treatment of ilioinguinal neuralgia.  Six weeks ago, Steven had surgery in Las Vegas for reexploration of the hernia site.  He was told that the mesh had created an abscess and it was malpositioned.  The surgical procedure has dramatically reduced his symptoms.  He is no longer holding an ice bag on his groin, as he has been with every visit with me in prior months.  In general, Steven looks better.  He is much happier and has a positive outlook for the future.

Steven is six weeks out from his most recent surgery.  He still continues to have some pain especially with bending over or lifting.  We discussed that he may experience these things for a few months and he is probably pushing himself trying to lift heavy objects such as car batteries at this point in his recovery.  I have prescribed Flexeril to treat muscle spasms during his recovery.  Hopefully, Steven will continue his improved course of recovery over the next several weeks.  Steven will follow up p.r.n.

KEVIN F. LASKO, M.D.

KFL/cv



EVIDENCE SUBSECTION FIVE   page 5

SCANNED
FEB 1 1 2011



**CMI** Claims Management, Inc.
Respect·Service·Excellence

November 17, 2010

Steven Hicks
3475 Hensley St
Reno, NV 89503

Re:            Steven Hicks
File #:         6068580
Date of Loss:  05/03/2010
Store#:        2106

Dear Steven,

In reviewing your Wal-Mart workers' compensation claim, it was discovered that you missed your appointment on 11/4/2010 and 11/12/2010, and that you have not scheduled a follow up appointment.

This letter is to inform you that your medical benefits and Temporary Total Disability (TTD) will be suspended until you comply with medical treatment.

If you wish to continue treatment for your injury, please schedule a follow up appointment and contact me at 877-473-1147+83742 within 15 days from the date of this letter. If we do not receive a response, your claim could be closed.

If you have any questions, please call.

Sincerely,

Leslie Ribadeneira
Claims Examiner
877-473-1147+83742

EVIDENCE
SUBSECTION
FIVE  page 6

**Sedgwick Claims Management Services, Inc.**

P. O. Box 1288 - Bentonville, AR 72712-1288
CLAIMS MANAGEMENT, INC. (DBA) CLAIMS MANAGEMENT. INC. OF ARKANSAS
ARKANSAS CLAIMS MANAGEMENT, INC.
PHONE: (877) 473-1147 • FAX: 479-204-9530

LAW OFFICE OF

# LAWRENCE B. BERNARD, Esq.

### ATTORNEY AND COUNSELOR AT LAW

### DISBURSEMENT

### RE: STEVEN HICKS

Award ..................................................................................................................$1,929.76

Attorney's Fees Pursuant to Agreement ...........................................................$643.25

**BALANCE TO STEVEN HICKS** ...............................................................**$1,286.51**

WE HAVE NO MEDICAL LIENS IN OUR FILE. ALL EXISTING MEDICAL BILLS
NOT PREVIOUSLY PAID ARE YOUR RESPONSIBILITY.

DATED: 20 JAN 2011

STEVEN HICKS

EVIDENCE
SUBSECTION
FIVE    page 7

*3690 Grant Avenue  Reno, NV 89509  775)324.4000   775)324.6414 fax*

**EVIDENCE SUBSECTION SIX**

# Prehospital Care Report Summary

## REMSA - REMSA

Date: 06/10/2011 Call #: 161036 Booklet: 70095110 Branch:1

*page ONE*

## Call Information:

Call Origin:911　Run Type: Emergency　Disposition: Treated/Transported
Unit #:0337 - 337, Ambulance - Land　Lights/Siren: Scene
Incident Loc:3475 GULLING RD - Reno, NV 89503 (Washoe County)
Location Type:Residence (Home)
Receiving Facility:RRMC--RENOWN REGIONAL MEDICAL CENTER (H) - 1155 Mill St - Reno, NV 89502
Dest. Reason:Patient/Family Choice
Loaded Mileage:6.0
Crew Members:Zebulon Nomura, EMT Paramedic*(DOC)*; Kyle Fine, EMT Intermediate*(DS)(DH)*

Moved to Amb By:Stretcher
Transport Position:Semi/Full Fowlers

| | |
|---|---|
| # Patients:1 | |
| # Patients at Scene:1 | |
| Call Received:07:35:41 | |
| Dispatched:07:35:51 | |
| En Route:07:36:49 | |
| On Scene:07:42:43 | |
| Patient Contact:07:43:00 | |
| Left Scene:08:01:40 | |
| At Destination:08:15:59 | |
| In Service:08:35:25 | |

Time On Scene:19 Min
Time to Destination:40 Min
Total Time of Run:60 Min

## Patient Information:

Name:STEVEN HICKS
Address:3475 GULLING RD - Reno, NV 89503
Phone:
SSN:
PMH:Other
Comment:HERNIA SURGERY '10X2
Env Allergies: NKA

Onset:06/10/11
DOB:11/13/1957
Gender:Male
Age:53 Years
Broselow Tape:
Weight:275.0 lbs

Med Allergies: PCn

Medicare:
Medicaid:
Auth Signature:Yes
Privacy Sig:No
Unable to Sign:No
Refused to Sign:No

Current Meds: BENAZEPRIL
LYrica
PRILOSEC (OMEPRAZOLE)
FLexeril

Ins. Type:　Policy Name:
Payor:　Policy:
Group:

## Clinical:

Dispatch Reason (EMD):06D04　Breathing Problems
Provider Impression:Anxiety
Mechanism of Injury:NA
Chief Complaint:Dyspnea-SOB
Protocol 1:General or Trauma　Protocol 2:
Supportive Care

Medical Need:
Medically Necessary

## Initial Assessment:

Airway: Patent
Breathing - Rate:Normal　Quality:Unlabored　Lung Sounds: Left: Clear　Right: Clear
Skin - Color:Normal　Temp:Normal　Condition:Normal　Cap Refill:<2 Seconds　Edema:None
Pupils - Left:Reacts　Right:Reacts
Glasgow Coma Score - 1: E (4) + V (5) + M (6) = 15　2: E (4) + V　Trauma Score:12　AVPU:Alert
(5) + M (6) = 15
Rhythm 1: NSR　Rhythm 2: NSR

## Vitals:

Qty Supply

| Time | PTA Employee | BP | Pulse | Resp. | SPO2 | CO2 | B.Sugar | Pain | Temp |
|---|---|---|---|---|---|---|---|---|---|
| 07:50 | K. Fine | 150/88 | 84 | 14 | 97 | | | | |
| 08:09 | | 140/72 | 87 | 14 | 100 | | | | |

## Treatments/Medications:

| Time | PTA Employee | Treatment | Level | Medication | Dose | Unit | Route | Att | Unable |
|---|---|---|---|---|---|---|---|---|---|
| 07:44 | Z. Nomura | ALS Assessment | ALS1 | | N/A | N/A | N/A | N/A | No |
| 07:50 | Z. Nomura | Nasal Cannula | BLS | Oxygen* | 2.00 | LPM | Inhalation | N/A | No |
| 07:54 | K. Fine | ECG monitor | ALS1 | | N/A | N/A | N/A | N/A | No |

## Narrative History Text:

HISTORY OF PRESENT ILLNESS: ON FRIDAY, JUN 10 WE FIND A 53 YEARS OLD MALE PATIENT PRESENTING WITH DYSPNEA-SOB WHICH STARTED ON FRIDAY, JUN 10.

TREATMENT PRIOR TO OUR ARRIVAL BY RENO FIRE DEPARTMENT:
VITALS AND INITIAL ASSESSMENT
UPON ARRIVAL TO PATIENT AT 07:43:00 , THE FOLLOWING ASSESSMENT WAS COMPLETED.

STATES THAT HE HAS BEEN FEELING ILL FOR SICK/ILL FOR THE LAST DAY AND A HALF. HE HAD CALLED US FOR SOB ODAY BUT HE FEELS MORE LIKE HIS THROAT IS DRY AND IRRITATED. PT ALSO FEELS LIKE HIS BP IS HIGH SINCE HE DID NOT TAKE BP MED. PT IS ALSO COMPLAINING OF BURNING IN HIS FACE AND NECK. PT STATES THAT HIS PAIN IS TOLERABLE BUT HE HAS NOT TAKEN HIS DAILY LYRICA OR FLEXERIL. UPON ARRIVAL PT WAS SITTING ON THE FLOOR WITH RFD AND HE IS A/OX4. PT DENIED ANY CP, SOB, DIZZINESS, OR TRAUMA. PT HAD AN ELEVATED BP WITH A NORMAL RA SAT. PT WAS N. SINUS ON THE MONITOR. PT HAD CLEAR LUNG SOUNDS BILAT AND HE HAD WALKED OUT TO THE UNIT. PT HAD AN ELEVATED BP AND NORMAL RA SAT. PT WAS TRANSPORTED TO RRMC
RESPIRATORY SYSTEM: PATIENT'S AIRWAY -PATENT ; BREATHING RATE - NORMAL, BREATHING QUALITY - UNLABORED; LUNG SOUNDS (L)-CLEAR (R)- CLEAR

CARDIOVASCULAR SYSTEM: SKIN COLOR -NORMAL, TEMPERATURE-NORMAL, CONDITION -NORMAL, CAP REFILL -2SEC, EDEMA -NONE.  INITIAL RHYTHM -NSR (SEE ATTACHED EKG STRIP).

NEUROLOGICAL SYSTEM: PUPILS (L) REACTS, (R) REACTS, MENTAL STATUS - ALERT, INITIAL GLASCOW - 15.

PHYSICAL ASSESSMENT:

SKIN:WNL

HEAD/NECK:WNL

CHEST:WNL

ABDOMEN:WNL

PELVIS:WNL

EXTREMITIES:W NL

BACK/SPINE:WNL

*EVIDENCE SUBSECTION SIX page Two* (handwritten, circled)

INITIAL VITALS AT 07:50:00: BP 150/88, PULSE 84, RR 14; OTHER IMPORTANT INITIAL FINDINGS -BLOOD SUGAR , PAIN , SPO2 97.

-----PAST MEDICAL HISTORY -OTHER HERNIA SURGERY '10X2.

-----CURRENT PATIENT MEDICATIONS = LYRICA

-----ALLERGIES: NKA, PCN

PROVIDER IMPRESSION(S): ANXIETY

THE FOLLOWING TREATMENTS AND MEDICATIONS WERE PROVIDED:


07:44:00  ALS ASSESSMENT
07:50:00  NASAL CANNULA OXYGEN 2.0 LPM INHALATION
07:54:00  ECG MONITOR


PATIENT MOVED TO AMBULANCE BY STRETCHER AND TRANSPORTED IN SEMI / FULL FOWLERS POSITION TO RRMC--RENOWN REGIONAL MEDICAL CENTER.

CHANGES IN ASSESSMENT ENROUTE:

PT LEFT IN RRMC--RENOWN REGIONAL MEDICAL CENTER ROOM # ( 35 ) WITH REPORT GIVEN TO (   ER  )RN.

COMPLETE PRINTED CHART LEFT AT HOSPITAL ( N  )
COMPLETE PRINTED CHART NOT LEFT AT HOSPITAL (  ) FAXED AT: (TIME)


PERSONAL BELONGINGS LEFT WITH: FAMILY ( ), ER ( ), PT ( )
LIST HERE:NONE

SIGNATURE FOR TRANSPORTATION/BILLING OBTAINED FROM:

X) - PATIENT; ( ) - PATIENT'S WIFE; ( ) - PATIENT'S HUSBAND; ( ) - PATIENT'S SON;
( ) - PATIENT'S DAUGHTER; ( ) - PATIENT'S GRANDSON; ( ) - PATIENT'S GRANDDAUGHTER;
( ) - PATIENT'S MOTHER; ( ) - PATIENT'S FATHER; ( ) - PATIENT'S LEGAL GUARDIAN;
( ) - OTHER; ( ) - EMPLOYEE SIGNED ON PATIENT'S BEHALF

**WITHIN NORMAL LIMIT (WNL) DEFINITIONS:

NEUROLOGIC: AAOX3, MAE STRONG AND = X4, MOTOR MOVEMENT PRESENT AND = X4, SENSATION GROSSLY INTACT X4, PERRL

RESPIRATORY: BBS CLEAR AND = THROUGHOUT, EUPNEIC, EQUAL CHEST EXPANSION

CARDIOVASCULAR: SKIN: PWD, PINK MUCOUS MEMBRANES, CAP REFILL 2SEC, HEART SOUNDS PRESENT, NO EDEMA, NO CYANOSIS

HEAD/FACE: SYMMETRICAL AND INTACT, NO LACERATIONS, ABRASIONS, BRUISES OR DEFORMITIES, NO SWELLING, NO DRAINAGE

NECK: NO ABNORMAL JVD, NO LACERATIONS, ABRASIONS, BRUISES, OR DEFORMITIES, TRACHEA MIDLINE

CHEST: NO LACERATIONS, ABRASIONS, BRUISES OR DEFORMITIES, NO SQ AIR/CREPITUS, NO PUNCTURE WOUNDS, NO PAIN/TENDERNESS ON PALP

ABD: SOFT, NON TENDER, NO VOMITING, NO LACERATIONS, ABRASIONS, BRUISES OR DEFORMITIES

PELVIS: STABLE, NON TENDER ON PALPATION, NO LACERATIONS, ABRASIONS, BRUISES, OR DEFORMITIES

EXTREMITIES: NO LACERATIONS, ABRASIONS, BRUISES OR DEFORMITIES

BACK-SPINE: NO LACERATIONS, ABRASIONS, BRUISES OR DEFORMITIES, NO PAIN/TENDERNESS ON PALPATION

## Signature Image(s):

Authorization Signature - 06/10/2011 08:16

LIFETIME SIGNATURE GUARANTEE AUTHORIZATION and GUARANTEE OF PAYMENT: I, the undersigned, hereby authorize all benefits to be made directly payable to REMSA/Care Flight. If I have Medicare, I request that payment of authorized Medicare benefits be made on my behalf to REMSA/Care Flight for any ambulance service provided to me by REMSA/Care Flight, WHETHER IN THE PAST, NOW OR IN THE FUTURE. I hereby authorize release of information including diagnosis from any hospital, doctor or any health care providers to REMSA/Care Flight for the purpose of submitting a claim for insurance benefits. I further authorize any holder of medical information or documentation about me to release to the Center for Medicare and Medicaid Services (CMS) and its agents and carriers, as well as to REMSA/Care Flight any information or documentation needed to determine benefits payable for any service provided to me by REMSA/Care Flight, whether in the past, now or in the future. I understand that I am financially responsible to REMSA/Care Flight for charges incurred by me for medical services and do hereby guarantee payment in full for any charges not covered or denied by Medicare or other insurance carrier. I further agree that if collection is made by suit or otherwise, I agree to pay all collection costs. I permit a copy of this authorization to be used in place of the original. I acknowledge that I have received a copy of REMSA/Care Flight's Notice of Privacy Practices, or that a copy will be sent to me with my bill.

Privacy Notice Signature

EVIDENCE SUBSECTION SIX    Page 3

Receiving RN / MD Signature

Technician Signature - 06/10/2011 10:32

A S S O C I A T E D
# Anesthesiologists
O   F   R   E   N   O

*EVIDENCE DEMAND SIX*

PATIENT:     HICKS, STEVEN

DATE:          August 31, 2010

REFERRING PHYSICIAN:  Kent C. Sasse, M.D.

CHIEF COMPLAINT:  Right groin pain.

HISTORY OF THE PRESENT COMPLAINT:  Steven is a 53-year-old male who had an open inguinal hernia repair six months ago.  Postoperatively, he has developed ilioinguinal neuralgia.  He has not had any specific treatment.  He uses ice, of which he wears most of his waking hours, to alleviate his pain.  He experiences some pain towards the abdomen as well as continuous pain down into the right testicle.  He feels aching pain into the testicle as if someone kicked him in the scrotum.

PAST MEDICAL HISTORY:  The patient has no significant medical problems.

SOCIAL HISTORY:  The patient is single.  He works as a cashier at Wal-Mart.  He is a nonsmoker.  He drinks no alcohol.

CURRENT MEDICATIONS:  He takes no medication with the exception of Xanax, which was given to him recently by his primary care physician.  He takes this p.r.n.  He says that it is not really effective.

MEDICINE ALLERGIES:  **Penicillin and sulfa drugs cause a rash.**

PHYSICAL EXAMINATION:  The examination is limited to the right groin.  There is a well-healed inguinal hernia incision.  There is nice tack over the incision.  There is moderate pain with palpation of the course of the ilioinguinal nerves into the surgical site.

ASSESSMENT AND PLAN:  Steven has postoperative ilioinguinal neuralgia.  I have discussed the difficulty in treating this problem.  There are medications that are useful.  I am going to prescribe Neurontin 300 mg three times a day.  I have also discussed injections of the ilioinguinal nerve.  He agrees to both therapies.  I have injected the area with 30 cc of 0.25% bupivacaine with 80 mg of Depo-Medrol.  The injection was done with a 25-gauge 1-1/2-inch needle.  Steven tolerated the procedure well.  He was given a prescription for 300 mg Neurontin t.i.d. and was advised to titrate his dose up slowly.  I also suggested ibuprofen 400 mg to 600 mg three times a day with meals.

S C A N N E D

SEP 1 0 2010

---

PATIENT: HICKS, STEVEN
DATE:  08/31/2010
Page 2


Steven will follow up with me in a month.


KEVIN F. LASKO, M.D.

KFL/cv
D:  08/31/10
T:  09/01/10
JOB #: 479058

cc:  Kent C. Sasse, M.D.



S C A N N E D

SEP 1 6 2010